# Richmond.

Southern Railway Co. v. Back's Administratrix.

March 23, 1905.

Absent, Cardwell, J.

1. RAILROADS—*Negligence—Injured Person Found Near Track.*—The mere fact that a person is found near a railroad track in an injured condition·is not sufficient to establish actionable negligence on the part of the railroad company.

2. RAILROADS—*Signal Tower—Expulsion of Intruder—Negligence.*—Expulsion of an intruder from a railroad signal tower at night is not such negligence as will render the railroad company liable for his death occasioned by being struck by one of its trains at a later hour, while walking on the company's right of way near to but not on its tracks, where it appears that, at the time of the expulsion, though he was drinking, he was not physically or mentally helpless, the place was not specially dangerous, and the servants of the company had no reason to suppose he was unable to care for himself. Nor is it negligence in such a case to fail to notify trainmen to look out for him, in view of his condition. In the case at bar, notice to the trainmen and increased vigilance on their part would have been unavailing, as deceased was at no time on the track, but was in the centre of the walkway between the tracks.

3. RAILROADS—*Telegraph Operator—Duty to Passengers and Employees— Trespassers.*—A telegraph operator, assisting in the movement of trains, owes a higher duty to passengers and employees on the trains than to mere trespassers, and he cannot abandon his post in order to conduct such trespassers safely off the premises of the railroad company when to do so would jeopardize such passengers and employees.

Error to a judgment of the Circuit Court of Orange county, in an action of trespass on the case, wherein the defendant in

error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*Horsley & Kemp,* for the plaintiff in error.

*Barbour & Rixey,* for the defendant in error.

Whittle, J., delivered the opinion of the court.

The defendant in error, who was plaintiff in the Circuit Court, instituted this action against the plaintiff in error, the Southern Railway Company, to recover damages for the alleged negligent killing of her intestate, B. O. Back.

The only assignment of error which demands consideration involves the action of the court in overruling the defendant's demurrer to the evidence, and rendering judgment against it for $5,000, the damages assessed by the jury.

The material facts in the case may be summarized as follows: Back met the accident which caused his death on the right of way of the defendant, between the stations of Orange on the south and Rapidan on the north. About two miles north of Orange there is a signal tower belonging to the defendant, known as "Spotswood." This tower is of the usual kind—a two-story structure, with the telegraph instrument and signal equipment in the upper room, which is reached by a winding stairway leading from the ground floor. It is located on the side of a cut 200 feet in length, and 22 feet in depth at the deepest point. In a southerly direction from the tower, the right of way had been prepared for another track, which had not been laid, and there was a level stretch about 20 feet wide extending some 400 yards to a public road cross-

ing. Between that crossing and the tower there was also a private road crossing. In a northerly direction, a side track occupied part of the right of way, between which and the main track there was an open space used as a walkway, 5½ feet wide between the ends of the cross-ties of the side track and main track, and 9 feet wide between the inner rails of the two tracks. Beyond the cut on the north there is a fill, which, at the point of accident, is 6 or 7 feet high. The tower was in charge of two operators, the hours of service of one being from seven o'clock in the morning until seven o'clock at night, and of the other from seven o'clock at night until seven o'clock in the morning. The duties of these operators were to manage the block system of trains, to receive and transmit orders regulating their movements, to display proper signals for their guidance and protection, and to render such other service in that connection as they might be called on to perform.

About sundown on January 30, 1901, Back was observed walking along the right of way of the defendant from the direction of Orange toward Spotswood, playing a mouth-harp. A witness, in response to the question if he appeared to be under the influence of liquor at that time, replied that "he was walking very fast and playing very fast, and making splendid music for a mouth-harp." He came into the telegraph office about 6:20 P. M. and asked the day operator then in charge if there was "any harm in it," and was told that he could get warm. Back was a laborer about forty years of age, and a stranger to both operators. In the conversation which ensued, he manifested familiarity with the neighborhood, and discussed with the operator the probabilities of securing employment for his sons with the defendant. He was somewhat under the influence of liquor, and while in the tower took several drinks from a pint bottle of whiskey in his possession, consuming rather more than half of its contents. As the time

approached for the arrival of the night operator, the day operator insisted on his going home, and arranged his bundles in order that he might carry them more conveniently. Back seemed indisposed to leave, and was engaged in a scuffle with the day operator when the night operator arrived; the first impression made on the latter being that they were fighting, and when he entered the tower Back took hold of his arm; but, on being told that he could not remain any longer, but must leave, followed the day operator out of the room and down the stairway.

In reply to questions as to Back's condition, the day operator stated that "he was rocking some, but could stand up all right. He could stand up pretty well," and he had no reason to suppose that he did not know where he was. The night operator said that he inferred he was drunk from the way he acted and talked. Another witness remarked that he thought from the language he was using he was drunk, but added, "he did not seem to be an over-drunk man." Still another witness expressed *the opinion* that it did not require much spirit to affect him, and that two or three drinks taken very close together would make him drunk. This is the substance of the direct testimony as to Back's condition.

On leaving the office, he set out in a southerly direction, but after going a short distance returned to the foot of the tower and entered into an altercation with the operator, who again urged him to go home. He then started south a second time, but shortly returned opposite the tower about the time a train passed going north. A few moments later he crossed over the main track and got upon the side track, and walked on that track in a northerly direction. This was the last that was seen of him until about one or two o'clock at night, when he was discovered by the crew of a passing train lying in the middle of the walkway between the main track and the side track, 490

yards north of the telegraph station. He had received a severe blow on the right temple, and his left arm was broken between the elbow and wrist. He never regained consciousness, and died from the injuries inflicted.

There was about one inch of snow on the ground that night, and his footprints plainly indicated that his course of travel from the tower to where he was discovered was along the side track for a part of the distance, and then along the walkway between the main track and the side track. The snow was undisturbed on the ends of the cross-ties, and he at no point went on the main track, but walked along the middle of the walkway after leaving the side track. The circumstances and character of his injuries would seem to warrant the conclusion that he was struck by a train (the evidence showing that quite a number of trains had passed between the time he was last seen and the time at which he was discovered), but by what train he was injured, and the details of the accident, are entirely matters of conjecture.

It is not contended that the agents of the company in charge of its trains were guilty of negligence, and there is no evidence tending to sustain that theory. As remarked, the footprints show that Back was never on the main track.

That the mere fact of his having been found in an injured condition near the track is not sufficient to establish actionable negligence on the part of the defendant, is shown by a number of recent decisions of this court. *C. & O. Ry. Co.* v. *Sparrow*, 98 Va. 640, 37 S. E. 302; *N. & W. Ry. Co.* v. *Cromer*, 99 Va. 794, 40 S. E. 54; *Southern Ry. Co.* v. *Hall*, 102 Va. 135, 45 S. E. 867; *C. & O. Ry. Co.* v. *Heath*, *ante* p. 64, 48 S. E. 508.

The ground on which the plaintiff rests her right to a recovery is the alleged negligence of the agents of the defendant in ejecting Back from the telegraph office in the night time,

and in such a state of inebriation, it is insisted, as would natur-
ally and probably have resulted in his death.   It is asserted
that after the operator had compelled him to leave the tower,
it was his duty to notify those in charge of passing trains of his
condition and danger, in order that they might keep a lookout
and avoid inflicting injury upon him.

Several answers to these contentions suggest themselves.
In the first place, Back was a trespasser upon the inclosed right
of way of the defendant, and an intruder, certainly after he
had been notified to depart, in its telegraph tower.   It appears
that his presence in the tower was in direct contravention of
the rules of the company, and his conduct and interference
with the operator in the discharge of his duties, a menace to
the safety of passengers and crews of trains, whose movements
it was the duty of the operator to protect by the prompt dis-
patch of orders and display of signals.   But, in addition to this,
the evidence does not sustain the contention that when Back
was induced to leave the tower he was either physically or
mentally helpless.   There is nothing in the evidence to suggest
that he was intoxicated to any such degree.   On the contrary,
he manifested by word and act familiarity with his surround-
ings.   He possessed the power of locomotion, and walked up
and down the winding stairway of the tower and elsewhere
without assistance.   His conversation and demeanor, especially
the manner in which he avoided the passing train at the tower,
and the course he pursued in travelling northward, all tended
to show that he was not in the condition of mental imbecility
and physical helplessness attributed to him.

With respect to the intimation that the operator ought to
have notified the trainmen of Back's condition:   The duty is
predicated of a degree of mental and physical helplessness
such as to have deprived him of the power of self-protection—
conditions, as observed, which were not present in his case.   It

also appears that it was not feasible in this instance for the operator to have located Back with any degree of accuracy, and if the trainmen had received notice and their assumed increased vigilance had led to his discovery in the centre of the walkway between the tracks, a position which the physical facts—his footprints in the snow—demonstrate that he occupied, they would have been justified in concluding that he was in a place of safety.

The authorities relied on to sustain the theory and contention of the plaintiff, are cases in which persons were ejected from trains; and where recoveries were upheld, the parties were in such helpless condition from intoxication, and the localities in which they were left were so dangerous, that their death was the reasonable and probable consequence of their expulsion. The case of *Waldron* v. *Louisville & Nashville Ry. Co.* (Ky.), 63 S. W. 580, 54 L. R. A. 919, upon which especial reliance is placed, affords an illustration of the class. Plaintiff's intestate, Fagg, had boarded a northbound freight train of the defendant about 8 o'clock at night in a drunken and utterly helpless condition, which was known to the agents of the defendant in charge of the train. Nevertheless, they ejected him from the train in a cut on a dark rainy night, in that condition, and with knowledge of the fact that other trains of the defendant would shortly pass through the cut. It further appeared that the defendant's superintendent at Nashville, Tennessee, and its agent at Franklin, Kentucky, had notice of Fagg's presence in the cut and his condition, in ample time to notify the crew of the northbound passenger train, which would shortly pass through the cut, of his presence and peril. He was run over and killed by that train, and the court held that his death was the natural and probable result of the misconduct of the defendant's agents, for which it was responsible. The distinction between that case and the case under consideration is too manifest to demand differentiating comment.

*Railway Company* v. *Valleley*, 32 Ohio St. 345, 30 Am. Rep.
601, is also cited by the plaintiffs. In that case Valleley
boarded a train of the defendant in a drunken condition, and
engaged in a violent struggle with a brakeman who endeavored
to control him. He was brandishing a knife and threatening
to shoot the conductor and certain passengers, and otherwise
conducting himself in such manner as to alarm and endanger
the safety of passengers. Under these circumstances he was
ejected from the train about eight or nine o'clock at night,
and the next morning was found about a third of a mile from
where he was put off, in a dying condition, from injuries in-
flicted by another train of the defendant. In that case, as in
this, the trial court held the defendant responsible on the
theory that its agents were guilty of negligence in leaving him
in a place of danger when he was too much intoxicated to pro-
vide for his own safety. In reversing the judgment, the Su-
preme Court of Ohio held that the flaw in the contention was
that it ·was not true that deceased was so drunk as to be bereft.
of intelligence. The court said: "He was ugly, fighting
drunk, vicious, and illustrating the qualities of a reckless des-
perado, but he had quite sense enough to take care of himself.
That there was no paralysis of his physical faculties is evident
from the manner in which he handled the brakeman; and
though all the witnesses recognized the fact of his intoxication,.
not one of them supposed that he was unable to take care of
himself. Those who speak of it, all say the reverse."

It may be remarked in this connection that in most cases of
expulsion of persons from trains it is practicable for those in·
charge, in exercising that right, to avoid the selection of places·
of unusual danger. But the conditions were wholly different
in this case. The operator, a lad 18 years of age, could have
exercised no control over Back's movements, even if it had
been permissible for him to abandon his ·post of duty. If it

So. Railway Co v. Back.

could be held that the defendant owed the plaintiff's intestate the duty of safe conduct from its premises, upon which he was an intruder and trespasser, surely it was in subordination to the higher duty which devolved upon it to protect its passengers and employees, whose safety imperatively demanded that the operator remain at his post. The principle that the defendant owed a higher duty to passengers and employees than to a bare trespasser, is elementary and recognized by all the authorities. *Joyner's Case*, 92 Va. 354, 23 S. E. 773; *Blankenship's Case*, 94 Va. 449, 27 S. E. 20.

Upon the whole case, the court is of opinion that the defendant's demurrer to the evidence ought to have been sustained, and it will be so ordered.

*Reversed.*