## STEWART v. SOUTHERN RAILWAY CO.

(Filed June 5, 1901.)

EVIDENCE—*Sufficiency—Railroads—Personal   Injuries—Contributory Negligence.*

Evidence in this case as to contributory negligence of an employee was sufficient to preclude a recovery and the plaintiff was properly nonsuited.

DOUGLAS, J., dissenting.

ACTION by J. J. Stewart, administrator of Julius Hargrove, against the Southern Railway Company, heard by Judge *H. R. Bryan,* at September Term, 1900, of the Superior Court of DAVIDSON County. From a judgment of nonsuit, the plaintiff appealed.

STEWART *v.* RAILWAY CO.

*Lee S. Overman,* for the plaintiff.
*Glenn & Manly,* for the defendant.

PER CURIAM.    We adopt the following opinion in this case prepared by the late Chief Justice *Faircloth:*

This is an action to recover damages for killing Julius Hargrove.    The plaintiff's intestate was a flagman, or brakeman, on defendant's work train, and was an old railroad man and knew the rules of railroads as to the passing of trains. The conductor of the work train stationed plaintiff's intestate at a point between Elmwood and the work train, to hear the freight train blow and to signal the work train out of the way of the freight train.    The signal was given, and as the work train went out the conductor said to him, "Stay here until I return; will follow 74 (freight train) right back." The intestate knew and expected that train 74 would come by as soon as the work train was out of the way.    He was then awake, sober and in his right mind.    Three hundred yards above the place where the intestate was injured, the freight train stopped to "fix a log" and could be seen that distance. The intestate was sitting on a cross-tie asleep within a few inches of the iron rail.    As the engineer of train 74 approached and saw a person sitting on the cross-tie, he assumed that he would get off, but, on nearer approach, seeing that the person did not move, he gave the alarm signal by sounding the whistle, ringing the bell, and applying the brakes.    The intestate was struck by the freight train, injured, and died soon afterwards.

When the conductor saw that the intestate did not move, it was too late to stop before passing the intestate.

The defendant introduced no evidence, and when the plaintiff closed, his Honor intimated that the plaintiff could not recover, and a nonsuit and appeal were taken.

In this and like cases the plaintiff's evidence is taken as

true. The rule on this subject has been so frequently and recently expressed by this Court that repetition seems to be superfluous work. However, in *Norwood v. Railroad,* 111 N. C., 240, the Court said: "When he placed himself in a position where he was liable to be stricken by a passing engine, it was his duty to keep a sharp lookout, and if he carelessly, recklessly and in a drunken stupor remained on the track when the engine was approaching, and till it came in contact with him, he was negligent. * * * If it were conceded that the engineer saw the deceased walking along the track, or sitting upright on the end of a cross-tie, in time to have stopped the train without peril or difficulty, he was justified in believing, up to the last moment, in the absence of knowledge or information, that he was insane or deaf, that the intestate would take reasonable precaution for his own safety by moving out of the way"—citing other decisions to the same effect, which decisions have been followed ever since.

In *Wycoff v. Railroad,* 126 N. C., 1152, the facts were not identical, but were similar and presented the same question. The plaintiff testified that he, being wearied, stepped off and sat on the end of a cross-tie to rest a few minutes, and while sitting there he dropped off to sleep and was knocked senseless by a passing train. · The Court affirmed *per curiam* the nonsuit on the authority of Norwood's case, *supra.*

Affirmed.

DOUGLAS, J., dissenting. I can not concur in the opinion of the Court. The answer alleges that "the said plaintiff's intestate, deliberately, with a reckless disregard of his own safety, sat down upon the railroad track and *fell asleep,"* and "that the engineer of said locomotive, when he saw a person sitting on the cross-ties, supposed that he would get off and thus escape injury. As he approached *quite close,* and seeing that the person did not move, he gave signals of alarm by

blowing the whistle and ringing the bell of the locomotive, thus endeavoring to warn the said person of the danger, and then seeing that he did not move, the engineer applied the brakes and did everything in his power to stop the engine, *but it was too late.*" The fireman testified as follows: "Bob James was engineer. He blew whistle twice, and made one application of brakes, and came over on my side and asked if he hit that man. We had done passed. This clearly shows what was practically admitted upon the argument, that the engineer neither blew the whistle nor gave any signal whatever until he was too close to the deceased to do any good. In the fateful words of the answer, "it was too late."

The opinion of the Court seems to be based exclusively on the cases of Norwood and of Wykoff, as those are the only cases cited. As the latter case was decided by a mere *per curiam* judgment, without setting forth either the facts or the law, it is a just precedent for neither.

The facts in Norwood's case were essentially different from those in the case at bar. In the former case, it appeared from the evidence that the engineer kept a constant lookout; that neither he nor the fireman saw the deceased at any time, and that owing to a curve in the track, it would have been impossible for the engineer to have seen him in time to have prevented the accident by stopping his train. There are in the opinion some unguarded expressions in the nature of *dicta,* that have been construed to mean that the engineer had a right to presume, up to the last moment, that the deceased would get off the track, and that therefore there was no duty resting upon the engineer to give any warning whatever until the last moment, when, of course, it would have been too late. The mere statement of the proposition exposes its inherent falsity. That it was a mere *dictum* is shown by the fact that the engineer never saw the deceased, and therefore had no occasion for any presumption of any kind.

If this was ever the meaning of Norwood's case, it has been clearly overruled in *Fulp v. Railroad,* 120 N. C., 525, where Justice *Furches,* speaking for a unanimous Court, says: "But the great error of the charge is that it is in violation of that great principle in favor of human life, so thoroughly settled in this State and in every jurisdiction, that the jury shall pass upon the acts of the defendant where negligence is alleged, and upon the contributory negligence of the intestate, if that is alleged. This has not been done in this trial. We have shown that it has not been done as to *sounding the whistle* in a sufficiently intelligible way to be understood whether it was passed on or not." As it was necessary for the jury to pass upon the fact whether or not the whistle was sounded, there surely must have been some recognized obligation upon the defendant to sound the whistle. It is true the whistle should have been sounded at the crossing, but it is equally true that Fulp's intestate was on the track 30 or 40 yards away from the crossing, and was never seen by the engineer, who did not know that he had struck him until the next day. If the defendant was liable for failure to blow at a crossing because it might have aroused a man lying 40 yards down the track, of whose existence it had no knowledge, how much greater would seem to be its negligence when the deceased was in full sight of the engineer.

I do not mean to say that in the case at bar the engineer should have stopped his train as soon as he saw the deceased sitting on the ends of the cross-ties; but I do say that he should have given him timely warning by bell or whistle, one or both. as might be necessary. It would have taken but little trouble to have sounded the whistle, and would not have interfered in the slightest degree with the running of the train. Surely a human life is still worth something—the pulling of a bell-cord, the opening of a whistle. Where a human life is at stake that may be saved by the sound of a whistle,

STEWART *v.* RAILWAY Co.

then it is *gross* negligence—call this an expletive if you will —not to blow the whistle.

Against the *dictum* in the Norwood case, I would respectfully invite the attention of the Court to the following authorities:

In *Finlayson v. Railroad,* 1 Dillon (U. S. C. C.), 579, 582, Federal Cas., No. 4,793, the Court says: "In this case the uncontradicted evidence on both sides is that the man who was killed was walking on the track of the defendant corporation along the same course the train was going that struck and killed him, and the question arises, what degree of precaution or care a railroad company or its servants are bound to take to guard against injuring a man under such circumstances. * * * I instruct you that the agents of the railroad company had a right to suppose he was such a man, of sound mind and sound hearing, and that he would take reasonable care to protect himself in case of danger. Under that view of the case, I further say to you that these agents or officers of the company *were bound to give a reasonable and fair notice of their approach,* when they found that the man was not taking steps to get out of the way—such a notice as would reach a man under ordinary circumstances of good hearing, and who had his attention alive to his situation. If then, you believe that the bell was rung and that the whistle was sounded, in time to enable this man to get off the track, these parties are guiltless, and the company is not liable. If, on the other hand, you believe they delayed making any signal at all until it was entirely too late for him to get off the track, that they being aware of his presence, delayed to ring the bell or sound the whistle, until he could not have stepped aside and saved himself—*in that case there was negligence on the part of these employees, for which the railroad company is responsible.*"

This able opinion was written by Justice *Miller,* of the U. S. Supreme Court, and concurred in by Judge *Dillon.*

Their names are a sufficient guarantee of the value of the opinion. The italics in this opinion are my own.

The same rule was laid down by the Supreme Court of Pennsylvania as far back as 1864, in *Railroad Co. v. Spearen*, 47 Pa. St., 300, 304, as follows: "The principle may be illustrated thus: If the engineer saw the adult in time to stop his train, but the train being in full view, and nothing to indicate to him a want of consciousness of its approach, he would not be bound to stop his train. Having the right to a clear track, he would be entitled to the presumption that the trespasser would remove from it in time to avoid the danger, or, if he thought the person did not notice the approaching train, *it would be sufficient to whistle* to attract his attention without stopping. But if, instead of the adult, it were a little child upon the track, it would be the duty of the engineer to stop his train upon seeing it."

These are the words of a court of recognized ability and one that has certainly never been inclined to hamper railroad management by useless restrictions.

In *Louisville and N. Railroad Co. v. Morlay*, 86 Fed. Rep., 240, 242, the U. S. Circuit Court of Appeals, three Circuit Judges concurring therein, says: "The testimony shows that when from 200 to 300 feet away from the man, the danger of his situation was recognized by the engineer and fireman, and that from that moment to the instant of the injury they attempted, by blasts of the whistle and by shouts, to warn him; but the testimony of other witnesses and the fact that the man's attention was not awakened tend to show that the warnings were not given. Whether they were given, and whether an earlier effort to stop or reduce the speed of the train should have been made, were, therefore, questions for the jury." Citing *Coasting Co. v. Tolson*, 139 U. S., 551.

The following head-notes are taken from the case of *L. and N. R. Co. v. Tinkham*, 44 S. W. R. (Ky.), 439: "Where

the trainmen see a trespasser on the track in front of the train, *it is their duty to give timely warning of the danger,* and if necessary and practicable, to slacken speed and stop the train.

"2. Where an engineer saw a trespasser on the track 600 yards ahead of the engine, and neither gave the usual signal nor made any effort to stop the train until within 100 yards, the question of negligence was for the jury."

The following head-notes are from *Illinois Central Railroad Co. v. Hocker,* 55 S. W. R. (Ky.), 438: "Whether the servants in charge of the train gave *timely warning* of the approach of the train after discovering the presence of a trespasser on the track, was properly left to the jury.

"2. While the servants in charge of a train are not bound to stop the train upon discovering a trespasser upon the track, they should *warn* him by *sounding the whistle or ringing the bell,* having the right to presume, *when such warning has been given,* that he will get off the track in time to prevent injury."

In the recent case of *Houston, etc., R. C. v. Harvin,* decided in December, 1899, 54 S. W. R., 629, the Court of Civil Appeals of Texas lays down the rule in the following explicit terms: "The instruction sought, that the persons operating the engine 'are authorized to presume that a person seen on the track will leave such track in time to avoid injury and are authorized to act upon such presumption,' should have been qualified so as to show that such presumption *would not arise unless some warning is given* of the approach of the train. *Railway Co. v. Smith,* 62 Tex., 254. Without this qualification, the Court was not required to give the instruction."

The rule is thus laid down in 2 Shearman and Redfield on Negligence, sec. 483: "Thus a locomotive engineer or motorman, after becoming aware of the presence of any person

on, or dangerously near the track, *however imprudently or wrongfully,* is bound to use as much care to avoid injury to him as he ought to use in favor of one lawfully and properly upon the track, that is to say, ordinary care with respect to anticipating injury, before it becomes imminent, and the utmost care and diligence of which he is personally capable, after he knows that it is imminent.     He *must promptly use all the usual signals to warn the trespasser of danger, and he must also check the speed of his train,* and even bring it to a full stop, if necessary, unless the circumstances are such, as to justify him, acting prudently, in believing that the traveler sees or hears the train and will step off the track in ample time to avoid all danger, without any diminution of the speed of the train."     Numerous authorities are cited by the learned authors.

In Patterson's Railway Ac. Law, the author says, in sec. 204, page 197: * * * "When they (engineers) do see a trespasser on the line, apparently of adult years and of average capacity, *they are bound to warn him by signal of his danger.* and that having done so, they may assume that he will get off the line, and that they are only bound to stop the train when the circumstances of the locality are such (for instance on a bridge or in a narrow cutting) that the trespasser does not have an opportunity to escape, or when the trespasser does not apparently hear or heed or comprehend the warning of his danger."

In 2 Wood on Railways, the author says, on page 1461: "If, after becoming aware of the trespasser's presence, the engineer *fails to exert every effort possible to prevent the injury,* the company must be held liable."     Again, on page 1463, he says: "Therefore, where an adult person appears on the track, the company has a right to presume that *he will heed the warnings* of approaching danger and protect himself, and is not bound either to stop the train or to slacken its

speed." Again, on page 1470, he says: "Of course this rule requires the company, where there is reason to apprehend that a person seen upon the track *will not heed the signals of danger,* and take himself out of the way of the train, to use reasonable diligence to stop the train and avert the serious consequences likely to ensue from failure to do so; but this condition as we have seen does not apply, as a rule, except where it is observable that the person is not in possession of his faculties, or is so young that it can not be reasonably expected that he will avoid the threatened danger."

All these quotations are in the same section, 320, and apply to the same subject. They tend to show that, even where the author does not say in so many words that the signals must be given, he proceeds upon the assumption that they are given.

The cases of McAdoo and Meredith are not cited by the Court, perhaps because the facts therein are so different from those before us; and yet both opinions contain expressions in the nature of *dicta* that would seem to support the opinion of the Court. Neither case is an authority. Meredith stepped in front of a train that was *backing,* and there seems to be no evidence that the engineer either saw him or could have seen him. Therefore, there was no room for presumption. In McAdoo's case the opinion says, on page 153: "The plaintiff 'would not swear' that the bell was not rung, while the engineer and firemen both testified that *it* was rung." Therefore, it seems that the warning was given, and again the presumption was excluded. The error in these *dicta* arises from the singular misapprehension of the Court as to the legal effect of the presumption, which simply relieves the engineer from the obligation of stopping his train, but *not* from the duty of giving *timely warning.* The McAdoo case is a marked instance of those numerous cases in

which appellate courts fail to apprehend the real point attempted to be presented. Both McAdoo and the engineer swore that McAdoo was walking between four and five miles an hour, and the engineer swore that the train was not going over four miles an hour, the speed limited by city ordinance. If this were so, it would have been a physical impossibility for the train to have overtaken McAdoo. And yet this Court gravely says, on page 154: "If it was running at five miles an hour (and the only testimony is that it was running four or five), it is manifest that a reduction of the speed to one mile less an hour would not have prevented the injury by enabling the plaintiff to see with his face turned in the opposite direction." Of course not, but it would have prevented the injury by preventing the train from ever overtaking him. Moreover, the warning by bell or whistle is addressed to the sense of hearing, and not to the sense of sight. The duty of giving warning to a man walking with his back to the engine is imposed to enable him to exercise the only sense which the laws of nature permit him to use under such circumstances. Is not this common sense, even if opposed to the speculative *dicta* of Judges of acknowledged ability and learning?

It would be needless to deny that I regret the decision of this Court, because it seems to me a retrogression. It happened that the decision of the Greenlee case, governing also that of Troxler, depended upon my individual vote, and that vote I gave for what will ever be to me the sacred cause of humanity. The same principle impels me now to file this dissent. We then held that it was negligence in a railroad company not to have automatic couplers, because a prudent man, having due regard for human life, would have all such safety appliances as were in common use and within his reach. But we did not say, and we could not say, that the railroads must have such couplers; but we did say that the

failure to have them would be such continuing negligence as would render them liable for any resulting injury. We thus placed upon them practically the burden of obtaining such couplers. Is it any greater, or as great, a burden, to require them to ring a bell or blow a whistle when a human life is at stake? The trespasser may be sick, or even drunk, but he is a human being, and why not give him a chance for his life when it will not interfere in the slightest degree with the running of the train? Conditions have changed in recent years. In former times the railroad train, with its long, loose coupling, alternately taking up and letting out the slack, and with rails loosely set in chairs and rattling at every joint, made noise enough to be heard a mile away; and as it took three or four minutes to travel that mile, the trespasser on the track had time enough to collect his senses. Now the vestibuled train, with its close coupling and patent buffers, makes but little noise on a track that the fish-bar has practically made into one continuous rail; while its terrific speed gives but a few second for thought or action after it comes within hearing. As our decisions have professed to meet other progressive emergencies, why not do so in the present case, when its object can be attained without imposing any additional burden upon the railroad company? But it may be said we have held to the contrary. Suppose we have, no rule of property is involved, and if we are wrong, who can correct our errors except ourselves? As has been well said by the great Chief Justice of Georgia, this Court is supreme in the majesty of duty as well as in the majesty of power. In view of the foregoing authorities, so thoroughly consistent with the highest principles of public policy and the enlightened humanity of a Christian age, I most respectfully dissent from the opinion of the Court.